UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

PATRICIA LASHAWN WIGGINS,

       Plaintiff,

    v.                           ACTION NO. 4:05cv157

DAVITA TIDEWATER, LLC,

       Defendant.

## MEMORANDUM OPINION AND ORDER

This matter comes before the court on the defendant's Motion for Summary Judgment. For the reasons set forth below, the court **GRANTS** the defendant's motion.

## I. Procedural History

On November 21, 2005, the plaintiff, Patricia Lashawn Wiggins ("Wiggins"), filed a three-count complaint against her former employer, DaVita Tidewater, LLC ("DaVita"). In Counts One and Two, the plaintiff alleges that the defendant violated her rights under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213, by failing to accommodate her disability, creating a hostile work environment, and disclosing her confidential medical information. In Count Three, the plaintiff alleges that the defendant violated her rights under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601-2654, by terminating her employment and health benefits without notice prior to the conclusion of her

entitled FMLA leave.

The defendant filed its Motion for Summary Judgment on July 28, 2006, and submitted various exhibits to that motion, including affidavits, documents, and deposition transcripts. The plaintiff filed her response on August 8, 2006. The defendant replied on August 11, 2006.

## II.  Factual Background

Wiggins began working for DaVita as a Patient Care Technician ("PCT") at its Hope Dialysis Clinic in Hampton, Virginia, on April 10, 2000. As a PCT, Wiggins worked under the license of a charge nurse and supervision of the Facility Administrator, Catherine Kyle ("Kyle"). In this role, Wiggins provided care to patients who suffer from chronic kidney failure. As part of her employment, Wiggins received an employee handbook, which outlined DaVita's policies regarding disability discrimination and FMLA leave.

On December 27, 2002, while working at DaVita, Wiggins suffered a "panic attack" or "nervous breakdown" in front of numerous co-workers and patients. Wiggins admits that the charge nurse at the time, Vanessa Hurdle ("Hurdle"); co-workers, Janice Labre, Julie Wallace, Mary Murphy, Linda Finney, and Lashaunda Brown; and patients, James Cook and Annie Williams, were all present and aware of her "attack" or "breakdown." DaVita contends

that eighteen other patients were also present.  Because of her condition, Wiggins left DaVita and her patients without permission and sought treatment at the emergency room.

Shortly thereafter, in early January 2003, Douglas H. Chessen, M.D. ("Dr. Chessen") diagnosed Wiggins with bipolar disorder.  Even though she was not required to do so, Wiggins authorized and directed Dr. Chessen and Jessica Adams ("Adams"), her nurse, to disclose information about her diagnosis and medical condition to DaVita.  As a result, on March 12, 2003, Adams informed Kyle that Wiggins was diagnosed with bipolar disorder.  Upon learning this information, Kyle asked Adams follow-up questions about Wiggins's condition.

Because of her diagnosis, Wiggins requested, and DaVita allowed her, to take twelve weeks of FMLA leave from December 27, 2002, to March 25, 2003.  Wiggins signed a "Request for Leave of Absence" form, which stated that the leave was considered FMLA leave and that its maximum period was twelve weeks.  A week before this FMLA leave was to expire, Kyle contacted Wiggins by telephone to remind her of the ending date.  After receiving this information, Wiggins returned to work on or around March 25, 2003.

Upon Wiggins's return, Kyle asked Shirley Headrick ("Headrick"), another PCT at DaVita, to monitor Wiggins's work, help if needed, and report any problems related to her care of patients.  Wiggins alleges that Kyle also asked other co-workers to

3

monitor her work.   Wiggins also contends that Kyle shared her confidential medical information with patients and co-workers. Wiggins bases this allegation on the fact that a number of patients inquired about her recovery when she returned from leave.   Kyle, however, denies sharing Wiggins's medical information or asking staff members, other than Headrick, to monitor Wiggins's work.

After Wiggins returned, DaVita hired David Chase ("Chase") and quickly promoted him to charge nurse.   Because of this promotion, Chase became Wiggins's direct supervisor.   It is undisputed that problems then developed between Chase and Wiggins.   Wiggins claims that Chase made two discriminatory remarks to her related to her illness and subjected her work to more scrutiny than other PCTs. First, Wiggins contends that on one occasion, while in her presence, Chase told other DaVita employees that "[y]ou have to excuse [Wiggins], I don't think she took her medication today." Second, Wiggins alleges that Chase told her that she stared at him like she was "out in space," after he had directed her to perform a task and she failed to comply.   In addition, Wiggins contends that Chase watched her work more closely than other PCTs.   Although Wiggins did not provide specific examples of this increased scrutiny in her complaint, it appears that she is referring to written disciplinary warnings issued to her for being late to work, failing to monitor a patient, and making disrespectful comments to Chase in front of a patient.   Wiggins argues that the

4

discriminatory remarks and increased scrutiny caused her to relapse and require further FMLA leave.

Chase, on the other hand, claims that Wiggins simply did not like his management style and became combative on two occasions. In the first, Chase alleges that Wiggins became boisterous and told him to stay out of her section.  In the second, on April 20, 2004, Chase contends that Wiggins yelled at him in front of patients and co-workers.  Because of this second incident, Chase sent Wiggins home.  Before leaving the premises, Wiggins reported the incident to a management representative, and on April 26, 2004, Kyle met with both Chase and Wiggins.  During this meeting, Kyle contends that she offered Wiggins an opportunity to transfer to a neighboring DaVita facility, but that Wiggins refused.  Wiggins denies that DaVita ever offered this transfer.  Wiggins admits that Chase, after learning that his comment about her not taking her medication upset her, apologized for making the remark.  After this apology, Wiggins admits that Chase never made the comment again. Chase contends, however, that he did not know about Wiggins's mental illness at the time of the comment and only made it as a joke, which was common among Wiggins, Chase, and Headrick.  After this meeting and apology, Wiggins never reported any further problems with Chase or Kyle to DaVita.

Wiggins then took a second leave of absence under the FMLA, which began on May 7, 2004, and expired on July 30, 2004.  Wiggins

signed and returned her "Request for Leave of Absence" form, which once again indicated that the leave was considered FMLA leave and that the maximum period of unpaid leave was twelve weeks.  Dr. Chessen also signed and submitted a medical certification form, which stated that Wiggins should stabilize in six to eight weeks, which at the latest would have been July 14, 2004.  After Wiggins went on leave, DaVita received a letter from Dr. Chessen, dated May 3, 2004, which addressed Wiggins's conflict with Chase. Specifically, Dr. Chessen recommended that "some accommodation be made in her work situation.  Since I do not know the options that are available to accommodate her, I will not make specific recommendations.  I do think, however, that it would be appropriate that she not report to this individual [Chase] if at all possible." Other than Dr. Chessen's letter, Wiggins never personally requested any type of accommodation or made any specific inquiry regarding this recommendation to DaVita.  However, as detailed below, Wiggins never reported back to work at DaVita for any accommodation, if required, to be made.

While Wiggins was on her second FMLA leave, Kyle contends that she called Wiggins and left several messages in June, July, and August 2004, inquiring about when Wiggins could return to work. Wiggins asserts that she never received these messages.  After going on her second FMLA leave, it is undisputed that Wiggins's only contact with DaVita occurred on August 5, 2004, when she

called Kyle about a bonus.  During this conversation, Kyle asked Wiggins when she planned to return to work, and Wiggins responded that she was unsure and was still under her doctor's care.  After this conversation, Wiggins never again contacted DaVita.  Wiggins admits that she never asked for an extension of FMLA leave and that it expired on July 30, 2004.

On November 15, 2004, DaVita terminated Wiggins's employment and health benefits, retroactive to October 31, 2004.  DaVita paid all of Wiggins's health benefits and premiums through October 31, 2004.  DaVita ended Wiggins's employment for abandoning her job and failing to return from FMLA leave.  Wiggins contends that DaVita failed to provide her with notice of her termination.  Since September 2005, Wiggins has been employed as a PCT at Gambro, another dialysis center.  Wiggins reported that she is no longer receiving medical treatment or taking medication for her bipolar disorder.

### III. Analysis

### A. Motion for Extension of Time Under Rule 56(f)

As a preliminary matter, the court addresses the sole contention in Wiggins's response that DaVita's Motion for Summary Judgment, which is that the motion should be denied in light of the fact that it was "premature."  Even though the plaintiff makes no reference to Federal Rule of Civil Procedure 56(f), the court

construes "Plaintiff's Response to the Defendant's Motion for Summary Judgment" as a Motion for Extension of Time under Rule 56(f).  Rule 56(f) specifically provides that summary judgment should be refused or that summary judgment proceedings should be continued when "it appear[s] from the affidavits of a party opposing the motion that the party cannot for reasons stated[,] present by affidavit facts essential to justify the party's opposition."  FED. R. CIV. P. 56(f).

This court finds that Wiggins's Rule 56(f) motion is without merit.  First, the primary basis of the motion is simply that Wiggins "has not had adequate time or the opportunity to discover essential information" from Kyle or Adams.  Pl. Resp. to Def. Mot. Summ. J. at 3-4; Tyson Aff. ¶ 12 (affidavit of plaintiff's attorney).  However, Wiggins has failed to present any specific facts that would be unearthed during this additional discovery.  Under Rule 56(f), a party must support this motion by "specifying which aspects of discovery required more time to complete," Nguyen v. CNA Corp., 44 F.3d 234, 242 (4th Cir. 1995), and how the facts developed in that time will be useful in resisting summary judgment.  See Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244-46 (4th Cir. 2002); 11 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE, ¶ 56.10[8][d] (3d ed. 2000).  Furthermore, the Fourth Circuit has held that a "'party may not simply assert in its brief that discovery was necessary and thereby overturn summary

judgment when it failed to comply with the requirement of Rule 56(f) to set out reasons for the need for discovery in an affidavit.'" See Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 691 (4th Cir. 1996) (quoting Nguyen, 44 F.3d at 242. In this case, Wiggins's Rule 56(f) motion gave no hint of what additional facts might have been gained through additional discovery or how such facts might have helped Wiggins carry her burden in opposing summary judgment. Instead, Wiggins made only generalized statements through counsel regarding the need for more discovery from Kyle and Adams. Furthermore, this case was filed by Wiggins on February 27, 2006. The court's Initial Pretrial Order, entered on March 9, 2006, and Scheduling Order, entered on March 31, 2006, required the plaintiff to complete discovery by July 6, 2006, and scheduled a jury trial for September 14, 2006. Wiggins did not serve her first discovery request until May 4, 2006, and never filed a motion for extension of her discovery period. Full discovery was allowed and completed, and the Final Pretrial Order was entered on September 8, 2006, with the jury trial still scheduled for September 14, 2006. Thus, Wiggins has failed to meet her burden to demonstrate that additional discovery would aid in rebutting DaVita's Motion for Summary Judgment, and her attorney's Rule 56(f) affidavit is insufficient to postpone a ruling on such motion.

Second, Wiggins alleges that summary judgment should be denied

or proceedings continued because the transcript from Kyle's August 1, 2006, deposition was not yet available by the time she was required to respond to DaVita's Motion for Summary Judgment. This argument is unconvincing because Wiggins's delay in taking the Kyle deposition was not the fault of DaVita, and Wiggins's counsel had access to information gained during this deposition prior to filing the response. Wiggins had opportunities to depose Kyle on May 17, 2006, and June 16, 2006, but canceled on both occasions, citing DaVita's failure to produce discovery documents. However, after Wiggins signed the Agreed Protective Order on June 9, 2006, DaVita produced the requested documents, and no deposition of Kyle was taken by the plaintiff until August 1, 2006. Furthermore, even without the transcript of the Kyle deposition, Wiggins's counsel had access to what was said during the deposition. See Strag v. Bd. of Trustees, 55 F.3d 943, 954 (4th Cir. 1995) (denying plaintiff's Rule 56(f) motion, in part, because plaintiff's counsel had access to what was said during a deposition even when a transcript was not yet available).[1]

Finally, Wiggins alleges that an extension of time should be granted because she has not yet had the opportunity to depose Adams. The court finds this argument entirely unpersuasive. Adams

---

[1]It is now the day before trial and Wiggins has not supplemented the Plaintiff's Response to Defendant's Motion for Summary Judgment with information from the transcript, which by now must either be available or unnecessary for trial.

is essentially Wiggins's own witness, and she has simply failed to interview, secure an affidavit, or depose Adams during her discovery period.  Adams was Wiggins's nurse, not an employee of DaVita.  Thus, Wiggins was free to contact Adams at any time, before or after filing suit against DaVita; however, Wiggins chose not to do so.  DaVita's cancellation of its own deposition of Adams, which was scheduled for July 28, 2006, and decision to secure an affidavit instead, does not provide Wiggins with grounds for an extension.  As a result, the purposes of Rule 56(f) have not been satisfactorily met by Wiggins.  Accordingly, the court will proceed to address DaVita's Motion for Summary Judgment at this time.

## B. Motion for Summary Judgment Under Rule 56(c)

### 1. Standard of Review

Federal Rule of Civil Procedure 56(c) provides that a court shall grant a motion for summary judgment if it finds "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  Thus, "the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (emphasis in original).  Summary judgment becomes appropriate when the court, having reviewed the record as a whole, finds that "it is not necessary to inquire further into the facts."  Haulbrook v. Michelin N. Am., Inc., 252 F.3d 696, 702 (4th Cir.

2001).

With respect to materiality, the substantive law determines which facts are relevant.  See Anderson, 477 U.S. at 248.  If the moving party demonstrates that there is a lack of evidence supporting an element essential to the nonmovant's case, the nonmovant must present evidence that establishes the existence of that element.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson, 477 U.S. at 248.  Thus, if the nonmovant argues facts that do not go to the element of his claim, then any dispute as to those facts is irrelevant and "will not be counted" by the court.  Id.

As to genuineness, if the moving party presents evidence that supports its motion, or demonstrates that there is a lack of evidence supporting the nonmovant's case, the nonmovant can show that a dispute is genuine only if it provides sufficient evidence so that a "reasonable jury could return a verdict for the nonmoving party."  Id.  All "evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  Id. at 255.  However, the nonmovant may not rest upon mere allegations in its pleadings, but rather must set forth specific facts demonstrating that there are genuine issues for trial, FED. R. CIV. P. 56(c), and must present evidence supporting those facts.  See

12

First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288-90 (1968).

## 2. ADA

In her first cause of action, Wiggins asserts that DaVita violated the ADA.  It is apparent from her complaint that Wiggins's claims include the following: (1) failure to accommodate; (2) hostile work environment; and (3) disclosure of confidential medical information.  For the reasons discussed below, Wiggins's claims fail as a matter of law.

### a. Failure to Accommodate

The Fourth Circuit has "clearly set out the elements of a failure to accommodate claim under the ADA."  See Metro v. Lewis Gale Clinic, No. 7:01CV00936, 2002 WL 32833260, *3 (W.D. Va. Apr. 26, 2002), aff'd, 48 F. App'x 456 (4th Cir. 2002).  To establish a prima facie case, the plaintiff must show that she (1) "was an individual who had a disability within the meaning of the statute;" (2) her employer had notice of her disability; (3) with reasonable accommodation she could have performed the "essential functions" of her position; and (4) her employer refused to make these accommodations.  See id. (citing Rhoads v. FDIC, 257 F.3d 373, 378 n.11 (4th Cir. 2001)); see also Rush v. Verizon Va., Inc., No. 7:04CV00093, 2004 WL 2900654, *3 (W.D. Va. Dec. 9, 2004).

The threshold requirement is that Wiggins have a "disability" as defined under the ADA.  The Fourth Circuit has specifically held

that the question of whether a plaintiff is disabled is a question of law for the court. See Hooven-Lewis v. Caldera, 249 F.3d 259, 268 (4th Cir. 2001). The ADA defines "disability," in part, as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A). In addition, the applicable federal regulation defines "substantially limits" as being unable to perform a major life activity or being significantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to that under which an average person in the general population can perform such activity. See 29 C.F.R. § 1630.2(j)(1). The regulation also provides examples of "major life activities," which include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(I). Although she does not specifically state so in her complaint, Wiggins's position appears to be that she is substantially limited in the major life activity of working.

Determining whether a person is disabled under the ADA is an individualized inquiry. See Sutton v. United Air Lines, Inc., 527 U.S. 471, 483 (1999); Forrisi v. Bowen, 794 F.2d 931, 933 (4th Cir. 1986). As it pertains to Wiggins, to qualify as having a disability under the ADA, she must establish: (1) that her bipolar disorder is a "physical or mental impairment"; (2) that working is

14

one of the "major life activities"; and if so, (3) that her bipolar disorder "substantially limits" her ability to work.  See Halperin v. Abacus Tech. Corp., 128 F.3d 191, 198 (4th Cir. 1997).  The plaintiff carries the burden of proving each element.  See id. at 199.  The parties do not dispute that bipolar disorder is a mental impairment and that working is a major life activity.  Consequently, whether Wiggins is disabled turns on whether her bipolar disorder substantially limits her ability to work.

As stated, a plaintiff claiming a mental disability must show a substantial limitation of a major life activity.  To do so, the plaintiff must offer evidence that the limitation caused by the mental impairment "'prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives,'" and that the impact is permanent and long-term.  See Lochridge v. City of Winston-Salem, 388 F. Supp. 2d 618, 626 (M.D.N.C. 2005) (quoting Toyota Motor Mfg., Inc. v. Williams, 534 U.S. 184, 198 (2002)).  As the Fourth Circuit has stated, "[i]n order to be substantially limited in the major life activity of working, 'one must be precluded from more than one type of job, a specialized job, or a particular job of choice.'  An individual must demonstrate that she is unable to work in a broad range of jobs."  Pollard v. High's of Baltimore, Inc., 281 F.3d 462, 471 (4th Cir. 2002) (quoting Sutton, 527 U.S. at 491-92) (internal citations omitted).  Additionally, "'[t]he inability to perform a

single, particular job does not constitute a substantial limitation in the major life activity of working.'" <u>Metro</u>, 2002 WL 32833260, *3 (quoting 29 C.F.R. § 1630.2(j)(3)(I)). Furthermore, the Fourth Circuit has stated that obtaining a new job is evidence that an impairment is not substantially limiting. <u>See Pollard</u>, 281 F.3d at 471 (holding that plaintiff's ability to work for a different employer reinforced that she was not substantially limited in her ability to work); <u>Halperin</u>, 128 F.3d at 200 (finding that plaintiff was not disabled under the ADA when "the record shows that [the plaintiff] could, and did, find comparable employment with a different employer"); <u>see also Heintzelman v. Runyon</u>, 120 F.3d 143, 145 (8th Cir. 1997) (stating that evidence of plaintiff's new job refuted the argument that she was unable to work).

In this case, Wiggins has not met her burden of establishing that her mental impairment substantially limits her ability to work. At most, she has demonstrated an inability to work under the supervision of Chase. First, Wiggins admitted that she could perform the duties required of a PCT, but asserted that she experienced stress at DaVita from working under Chase. Specifically, when asked to clarify whether her inability to work at DaVita resulted from her job in general or work with Chase, Wiggins herself admits, "[y]es, it was [David Chase], absolutely." Wiggins Dep. at 242:25 (May 16, 2006). Further, when asked what parts of her job she could not perform, Wiggins responded, "I can't

really say I couldn't do it.  It's just that at that job, at Davita, I wasn't able to work because it was so much stress there for me.  If I would have been relocated somewhere else, I could have worked well probably." Wiggins Dep. at 31:11-15. Second, Dr. Chessen's request that DaVita transfer Wiggins to a different supervisor further provides evidence of her ability to work, just not with Chase.  As numerous courts have held, "'the major life activity of working is not 'substantially limited' if a plaintiff cannot work under a certain supervisor because of anxiety and stress . . . .'"  Metro,  2002 WL 32833260, *4 (quoting Weiler v. Household Fin. Corp., 101 F.3d 519, 524 (7th Cir. 1996)); see Gaul v. AT & T, Inc., 955 F. Supp. 346, 348, 350-51 (D.N.J. 1997) (holding that if the plaintiff claims he merely needed to be transferred away from a particular supervisor, who caused him stress, then plaintiff is not disabled under the ADA), aff'd sub nom. Gaul v. Lucent Techs. Inc., 134 F.3d 576 (3d Cir. 1998); Hatfield v. Quantum Chem. Corp., 920 F. Supp. 108, 110 (S.D. Tex. 1996) (stating that employee's inability to work under a particular supervisor was not a substantial limitation on working, and thus, employee was not disabled under the ADA); DiGloria v. Am. Tel. & Tel. Co., No. 92-1179-CIV-ORL-19, 1993 WL 735034, *3 (M.D. Fla. Nov. 30, 1993) (holding that the gravamen of plaintiff's claim was that she was unable to work under the supervision of two individuals, and therefore she was not disabled).  As a result,

Wiggins's allegations do not indicate that she is significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes. Her complaint simply alleges that Wiggins <u>could not work as a PCT at DaVita under the supervision of Chase</u>, which is not sufficient under the ADA.

Moreover, the record shows that Wiggins subsequently applied for employment with numerous employers and obtained a job as a PCT at Gambro, a dialysis center owned by Renal Advantage, Inc., in September 2005. Her ability to work as a PCT belies her claim that she is "disabled." Wiggins admitted that her current job at Gambro is comparable to her prior job at DaVita. As evidenced by her current employment, Wiggins cannot demonstrate that she was precluded from working in a broad range of jobs. Furthermore, Wiggins is no longer receiving medical treatment or taking medication for her bipolar disorder. Based on the record at summary judgment, no reasonable jury could conclude that Wiggins's bipolar disorder significantly limits her ability to work. Accordingly, Wiggins does not possess a disability for which she may claim relief from discrimination.[2]

Even assuming <u>arguendo</u> that Wiggins was disabled, she still

---

[2]While Wiggins did not set forth a wrongful termination claim in her complaint, it would also fail because of her inability to show that she is disabled under the ADA. <u>See</u> <u>Rhoads v. FDIC</u>, 257 F.3d 373, 386 (4th Cir. 2001) (stating that claims for both wrongful termination and failure to accommodate under the ADA require a showing that the plaintiff is disabled).

failed to establish a prima facie case for failure to accommodate. Specifically, Dr. Chessen requested, on behalf of Wiggins, that DaVita transfer her away from Chase, who was allegedly the source of Wiggins's stress.  Wiggins, however, has failed to demonstrate that her request for a transfer constituted a reasonable accommodation.  The Fourth Circuit has stated that "'[a]n employer is not obligated to provide an employee the accommodation he or she requests or prefers; the employer need only provide some reasonable accommodation.'"  See Crawford v. Union Carbide Corp., 202 F.3d 257, 1999 WL 1142346, *4 (4th Cir. Dec. 14, 1999) (per curiam) (unpublished table decision) (quoting Baert v. Euclid Beverage, Ltd., 149 F.3d 626, 633 (7th Cir. 1998)).  An employer may avoid making such accommodation, however, by showing that the requested accommodation would impose an undue burden or hardship upon it.  See Lamb v. John Umstead Hosp., 19 F. Supp. 2d 498, 507 (E.D.N.C. 1998); Gaul v. AT & T, Inc., 955 F. Supp. 346, 352-53 (D.N.J. 1997) (finding that an employee's request for a transfer away from a particular supervisor was not reasonable and imposed an undue burden on employer).

To the extent that, in order to accommodate Wiggins, DaVita would have to insure that she would be guarded against stress and criticism from supervisors in general, this type of accommodation is not reasonable and would impose an undue burden on DaVita.  To the extent that the accommodation was to remove her from Chase's

supervision, Wiggins has failed to establish that DaVita refused to provide her with this requested accommodation.  By the time DaVita received Dr. Chessen's letter in May 2004, Wiggins had already taken her second FMLA leave, from which she never returned.  Further, Wiggins admitted that she never personally requested or inquired about securing a transfer before or after DaVita received Dr. Chessen's letter.  Because Wiggins never returned to work or inquired about the possibility of transferring from Chase's supervision, after taking her second FMLA leave, Wiggins has failed to establish that DaVita refused to provide her with the requested accommodation.  Thus, even if Wiggins was disabled, she has failed to set forth a prima facie case for failure to accommodate.

### b. Hostile Work Environment

42 U.S.C. § 12112(a) provides: "No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  The Fourth Circuit has previously held that the ADA's prohibition against discrimination on the "terms, conditions, and privileges of employment" provides a cause of action for a hostile work environment.  See Fox v. Gen. Motors Corp., 247 F.3d 169, 175-76 (4th Cir. 2001); Rohan v. Networks Presentation LLC, 192 F. Supp. 2d 434, 436 (D. Md. 2002).

Wiggins has not specifically stated that she is making a hostile work environment claim under the ADA, but she has alleged that the acts of which she complained have altered the terms and conditions of her employment.

To state a hostile work environment claim under the ADA, a plaintiff must establish: (1) she is a qualified individual with a disability; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her disability; (4) the harassment was sufficiently severe or pervasive to alter a term, condition, or privilege of employment; and (5) some factual basis exists to impute liability for the harassment to the employer. See Fox, 247 F.3d at 177; Rohan, 192 F. Supp. 2d at 437. Because the court has already determined that Wiggins does not have a disability within the meaning of the ADA, which is required under the first element, her hostile work environment claim fails. However, even assuming arguendo that Wiggins was disabled, the court finds no evidence that would support a reasonable finding that any alleged harassment was severe or pervasive enough to create an abusive work environment.

To recover on a hostile work environment claim, "a plaintiff must demonstrate not only that [s]he subjectively perceived [her] workplace environment as hostile, but also that a reasonable person would so perceive it, i.e., that it was objectively hostile." Fox, 247 F.3d at 178; see Mannell v. Am. Tobacco Co., 871 F. Supp. 854,

21

860 (E.D. Va. 1994).  The Fourth Circuit has further stated that "factors to be considered with respect to the objective component include 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" See id. (quoting Walton v. Mental Health Ass'n, 168 F.3d 661, 667 (3d Cir. 1999)).

Turning to the facts presently before the court, Wiggins specified three incidents in support of her claim for hostile work environment.  First, Wiggins asserts that Chase told other DaVita employees in her presence that "[y]ou have to excuse [Wiggins], I don't think she took her medication today."  It is undisputed, however, that Chase only made this comment once, apologized for it, and never repeated it.  Second, Wiggins alleges that, on one other occasion, Chase told her that she stared at him like she was "out in space," after he had directed her to perform a task and she failed to comply.  Third, Wiggins contends that Kyle told multiple co-workers to monitor her work with patients.  Wiggins, however, only provided evidence that Kyle directed Headrick to monitor her.  In this regard, Wiggins failed to establish how this alleged monitoring by Headrick adversely interfered with her work performance.

Even though Wiggins's evidence may establish that she subjectively perceived her work environment as hostile, it is

insufficient, when viewed objectively, to support a hostile work environment claim.  See Edmonson v. Potter, 118 F. App'x 726, 730 (4th Cir. 2004) (per curiam) (unpublished) (citing Faragher v. City of Boca Raton, 524 U.S. 775, 778 (1998) (holding that isolated or genuinely trivial acts constituting ordinary adversities in the workplace are not actionable); Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 753 (4th Cir. 1996) (finding that a working environment must be "hostile or deeply repugnant," not "merely unpleasant," to be actionable)).  However much Wiggins was offended by the comments or actions directed to her, they do not rise to the requisite level of severity or pervasiveness to fall under the ADA.  The incidents on which Wiggins relies are too isolated and only amount to "'conduct that sporadically wounds or offends but does not hinder' an employee's performance."  See Henry v. Guest Servs., Inc., 902 F. Supp. 245, 252 n.9 (D.D.C. 1995) (quoting DeAngelis v. El Paso Mun. Police Officers Ass'n, 51 F.3d 591, 593 (5th Cir. 1995)), aff'd, 98 F.3d 646 (D.C. Cir. 1996).  These three alleged instances, which occurred over a period of several months, do not amount to the kind of pervasive harassment that would alter a term, condition or privilege of employment.  See Rozier-Thompson v. Burlington Coat Factory Warehouse of Pocono Crossing, Inc., No. 3:05CV456, 2006 WL 1889651, *7 (E.D. Va. July 7, 2006) (holding that three inappropriate, insensitive, and offensive comments made to plaintiff by a co-worker were not "sufficiently severe to

constitute the type of deeply repugnant, humiliating treatment proscribed by the ADA").

Wiggins also appears to attempt to supplement her harassment claim by including within it her written disciplinary warnings issued by Chase and Kyle, concerning her being late to work, failing to monitor a patient, and making disrespectful comments to Chase in front of a patient.  However, no reasonable person could believe, given the factual evidence in the record, that these warnings could be characterized as harassment.  See Shiflett v. GE Fanuc Automation Corp., 960 F. Supp. 1022, 1036 (W.D. Va. 1997), aff'd, 151 F.3d 1030 (4th Cir. 1998).  Because the alleged harassment was not sufficiently severe or pervasive, summary judgment must issue in favor of DaVita on Wiggins's hostile work environment claim.

### c. Disclosure of Confidential Medical Information

The ADA limits the scope of information that employers may seek and disclose about their employees' medical conditions.  See EEOC v. Overnite Transp. Co., No. 7:01CV00076, 2001 WL 1521584, *2 (W.D. Va. Nov. 30, 2001) (citing 42 U.S.C. § 12112(d)); see also Heston v. Underwriters Labs., Inc., 297 F. Supp. 2d 840, 845 (M.D.N.C. 2003) (stating that "[t]he obvious purpose of subsection (d) is to limit the gathering and use of medical information as one of the ways to reduce the possibility of discrimination").  After an employee has begun working, an employer may not require a

medical examination nor make inquiries into an employee's disability unless the exam or inquiry is shown to be "job-related and consistent with business necessity."  See Rohan v. Networks Presentation LLC, 175 F. Supp. 2d 806, 813 (D. Md. 2001) (quoting 42 U.S.C. § 12112(d)(4)(A)).  Employers are allowed to gather disability information from current employees in two ways.  First, they may "'conduct voluntary medical examinations, including voluntary medical histories, which are part of an employee health program . . .'"  Id. (quoting 42 U.S.C. § 12112(d)(4)(B)).  Second, the employer "'may make inquiries into the ability of an employee to perform job-related functions.'"  Id.  The ADA requires that all information received by employers from these two channels be kept confidential.  See id. (citing 42 U.S.C. § 12112(d)(4)(C)); see also Heston, 297 F. Supp. 2d at 845 (noting that it is only when employers gather information pursuant to § 12112(d) that the duty of confidentiality is triggered).[3]

---

[3]"Courts in several circuits have read 42 U.S.C. § 12112(d) as requiring confidentiality of employee medical information only when the employer obtains this information as a result of an employee health program or an inquiry." Rohan, 175 F. Supp. 2d at 814 n.12. Specifically, the Eleventh Circuit held that § 12112(d) and accompanying regulations do not protect the confidentiality of "voluntary disclosures initiated by the employee." Cash v. Smith, 231 F.3d 1301, 1307 (11th Cir. 2000). In addition, the Sixth Circuit affirmed the holding of a district court, which also found that the statute goes no further than to require employers to keep this limited class of medical records confidential. See Yoder v. Ingersoll-Rand Co., 31 F. Supp. 2d 565, 569 (N.D. Ohio 1997), aff'd, 172 F.3d 51 (6th Cir. 1998). District courts have also held that employers did not violate § 12112(d) when disclosures of disabilities by employees were completely "voluntary." See Ballard

DaVita claims that the information disclosed by Kyle was not confidential medical information within the meaning of § 12112(d), because the information was not obtained as part of an employee health program or from medical examinations conducted at its direction.  Viewing the facts in the light most favorable to Wiggins, this court agrees and finds that DaVita did not violate the ADA.  Even assuming that Kyle told Headrick, co-workers, and patients that Wiggins was diagnosed with bipolar disorder, this communication was not an unlawful disclosure of confidential medical information under the ADA, because Kyle did not obtain the information from an employee health program or employer-mandated medical examination.  It is undisputed that Wiggins did not disclose her diagnosis as part of an employee health program and that DaVita never requested that Wiggins undergo a medical examination.  Instead, Wiggins received treatment from a private physician on her own initiative and voluntarily authorized Dr. Chessen and Adams to disclose her diagnosis to DaVita.  Since the information Kyle disclosed was not obtained pursuant to § 12112(d), DaVita did not violate the ADA.  Accordingly, the court **GRANTS** DaVita's Motion for Summary Judgment on this claim.

### 3. FMLA

In her second cause of action, Wiggins asserts that, while she

---

v. Healthsouth Corp., 147 F. Supp. 2d 529, 534 (N.D. Tex. 2001); Martin v. Kansas, 996 F. Supp. 1282, 1294-95 (D. Kan. 1998).

was on medical leave, DaVita violated her rights under the FMLA by terminating her employment and health benefits without notice. For the reasons discussed below, Wiggins's arguments fail.

Under the FMLA, an eligible employee suffering from a serious health condition is entitled to twelve weeks of leave during any twelve-month period. See 29 U.S.C. § 2612(a)(1). While an employee is out on FMLA leave, the employer must maintain the employee's coverage under any group health plan. Id. § 2614(c)(1). When the employee returns from leave, she must be restored to her previous position or an equivalent one. Id. § 2614(a)(1). The FMLA further provides that it is unlawful "for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise," any of the aforementioned rights. Id. § 2615(a)(1). However, an employer's obligation to restore the employee to the same or equivalent employment or to provide health benefits ceases if and when the employee fails to return from leave or continues on leave after exhausting her FMLA leave entitlement. See 29 C.F.R. § 825.209(f).

In this case, DaVita did not interfere with any rights of Wiggins under the FMLA, as she received all of the leave to which she was entitled. Wiggins's leave began on May 7, 2004, and expired on July 30, 2004. It is undisputed, however, that DaVita held Wiggins's position open and maintained her health benefits until October 31, 2004, when she was officially terminated for

abandoning her job and failing to return from FMLA leave.  Except for placing one telephone call to DaVita on August 5, 2004, to inquire about a bonus, Wiggins never contacted DaVita about returning to work, nor did she request an additional leave of absence.  Accordingly, Wiggins's FMLA rights were not violated, as she was allowed to stay out of work for twenty-five weeks, from May 2004 to October 2004, far more than the twelve weeks of leave required under the FMLA.  See Moticka v. Weck Closure Sys., No. 05-1231, 2006 WL 1526532, *4 (4th Cir. May 31, 2006) (per curiam) (unpublished) (holding that the employer did not violate the employee's rights under the FMLA when it provided the plaintiff with thirty-four weeks of FMLA leave); Drumheller v. Cent. Va. Elec. Coop., No. 3:06-CV-00010, 2006 WL 2403334, *7 (W.D. Va. Aug. 18, 2006) (holding that "once the twelve week period has expired, the time to claim entitlement to benefits under the FMLA cannot be enlarged or recaptured because no violation of the Act has occurred within the statutory benefit period"); Miller v. Personal-Touch of Va., Inc., 342 F. Supp. 2d 499, 515 (E.D. Va. 2004) (finding that the employer had no responsibility to restore plaintiff to her prior position following the expiration of the twelve week period), aff'd, 153 F. App'x 209 (4th Cir. 2005).

Wiggins also contends in her complaint that DaVita failed to provide her with notice of the length of her FMLA leave and of her termination.  The latter claim is not an obligation imposed upon

28

DaVita by the FMLA and will not be considered.  However, DaVita is required to provide Wiggins with individualized notice that her FMLA leave was being expended during her time off.  See 29 C.F.R. § 825.208(a) ("In all circumstances, it is the employer's responsibility to designate leave, paid or unpaid, as FMLA-qualifying, and to give notice of the designation to the employee as provided in this section.").  The question of whether the notice satisfied the statutory requirements is one of law.  See Miller, 342 F. Supp. 2d at 508 (citing Cavin v. Honda of Am. Mfg., Inc., 346 F.3d 713, 723 (6th Cir. 2003)).

As a matter of law, DaVita provided adequate notice that Wiggins's entire period of leave was taken for an FMLA qualifying reason and expressly informed her that she was entitled to take up to twelve weeks of FMLA leave for her medical condition.  DaVita complied with the FMLA's notice requirement when it prominently listed the length of Wiggins's leave on the face of DaVita's "Request for Leave of Absence" form, which Wiggins admits signing on two occasions.  Specifically, this form indicated that the time off related to Wiggins's leave would be considered FMLA leave and stated that "I understand that I have up to 12 weeks off in a 12 month period and that I will be guaranteed reinstatement to my current position."  Wiggins Dep. at Ex. 32.  In addition, it is undisputed that Wiggins received and reviewed the DaVita employee handbook, comprised of the FMLA policy, which states that an

employee is only entitled up to twelve weeks of FMLA leave for a serious medical condition.  Thus, Wiggins received adequate notice of the twelve-week limit under the FMLA.

Nonetheless, even assuming that the plaintiff did not receive adequate notice, the plaintiff identifies no prejudice stemming from this violation.  The Supreme Court held in <u>Ragsdale v. Wolverine World Wide</u>, 535 U.S. 81, 89 (2002), that the FMLA "provides no relief unless the employee has been prejudiced by the violation."  Any error regarding the designation of FMLA leave could not have prejudiced a plaintiff's FMLA right to return to work, however, when he was, by his own admission, unable to return to work.  <u>Kelso v. Corning Cable Sys. Int'l Corp.</u>, 224 F. Supp. 2d 1052, 1057 (W.D.N.C. 2002); <u>see</u> <u>Holmes v. e.spire Commc'ns, Inc.</u>, 135 F. Supp. 2d 657, 666 (D. Md. 2001) (finding that based on plaintiff's own deposition testimony, plaintiff was not able to return to work within twelve-week period and thus not entitled to relief under the FMLA).  Wiggins admitted in her own deposition that as of October 31, 2004, "I wasn't able to work" at DaVita.  Wiggins Dep. at 31:3-9.  Wiggins also stated that "It's just at that job, at DaVita, I wasn't able to work because it was so much stress there for me."  Wiggins Dep. at 31:10-13.  Therefore, Wiggins still would have taken her full twenty-five weeks of leave, regardless of the FMLA notice.  Accordingly, Wiggins has not shown prejudice.

Wiggins has failed to raise a genuine issue of material fact concerning her claim under the FMLA.   DaVita is, therefore, entitled to summary judgment on this claim.

## IV. Conclusion

For the reasons stated herein, Defendant DaVita's Motion for Summary Judgment is **GRANTED**, and the cause is **DISMISSED** from the active docket of the court.

The Clerk is **DIRECTED** to send a copy of the Memorandum Opinion and Order to counsel for all parties.

**IT IS SO ORDERED.**

_____/s/_____
Rebecca Beach Smith

Norfolk, Virginia

September 13, 2006